MEDICA PRIMARY, f/k/a
Share, Plaintiff,

v.

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS HEALTH AND
WELFARE FUND, Defendant.

No. C1–93–198.

Supreme Court of Minnesota.

Sept. 17, 1993.

Thomas B. Hatch, Lateesa Agunbiade, Minneapolis, for defendant.

Keith J. Halleland, William D. Hittler, Minneapolis, for plaintiff.

WAHL, Justice.

The United States District Court, District of Minnesota, Third Division has certified to this court, pursuant to Minn.Stat. § 480.061 (1992), two questions of law in an effort to determine whether the Health Maintenance Organization (HMO) Agreement at issue between the parties in this case is in violation of Minn.Stat. § 62D.04, subd. 1(f) of the Minnesota Health Maintenance Act. We answer the first certified question in the negative and do not reach the second certified question.

The federal district court based the questions certified upon the entire record in, this matter and upon the following statement of facts:

The plaintiff in this action is MEDiCA Primary, f/k/a/ Share ("Medica"), a not-for-profit Minnesota corporation certified to operate as a Health Maintenance Organization ("HMO") under the Minnesota Health Maintenance Act. Minn.Stat. §§ 62D.01–.30 (1992) (the "Act"). The defendant is Central States, Southeast and Southwest Areas Health and Welfare Fund ("Central States"). Central States provides health and welfare benefits, including medical coverage, to large numbers of truck drivers and their eligible dependents. Central States has its principal office in Rosemount, Illinois.

From February 1, 1975 through June 30, 1990, Medica and Central States entered into and performed certain health maintenance agreements for a portion of Central States' members and their eligible dependents living in the Minneapolis–St. Paul metropolitan area. Under these agree-ments, Medica was obligated to provide a network of physicians and hospitals for the designated Central States participants, and to pay the fees charged by these medical providers, in exchange for premium payments from Central States.

Between November 1989 and May 1990, representatives of Medica and Central States negotiated and reached agreement on a two-year renewal of the parties' health maintenance agreement.[1] (the "1990–92 Agreement") Under the terms of the 1990–92 Agreement, Central States was obligated to pay an interim premium of $261.00 per month per enrollee, in exchange for Medica's services. The 1990–92 Agreement also contained a provision allowing for annual retrospective adjustments to that interim premium, said adjustments to be based upon Central States' cost of providing medical services to its Minneapolis–St. Paul members who were not enrolled in an HMO-plan.[2] Any payments due as a result of an adjustment were to be paid within 120 days following the end of each one-year term.

On October 24, 1991, Central States reported to Medica a summary of its actual non-HMO member costs for the 1990–91 term. Also on that date, Medica reported to Central States its actual costs for the 1990–91 term. The October 24, 1991 letter from Medica further informed Central States that Medica could not comply with the retrospective premium adjustment provision in the 1990–92 Agreement because that provision violated the Act. Medica stated that the Act permits retrospective adjustment provisions only if they fall within the language of Minn.Stat. § 62D.04, subd. 1(f)(2), that is, if they are based upon the actual cost of providing medical services to actual enrollees in Medica's plan, and not Central States' cost of providing medical benefits to its non-HMO members, which was the basis for

1. The renewal was to run from July 1, 1990 through June 30, 1992.

2. The 1990–92 Agreement provided that the adjustment was limited to the extent that the *final* adjusted premium would not be less than $257.00 per month per enrollee, nor greater than [the lesser of] $274.76 per month per enrollee or Medica's "actual cost" of providing services under the parties' agreement.

the retrospective adjustment provision in the 1990–92 Agreement.

Subsequently, Central States withheld $38,992.00 of its May 1992 premium payment on grounds that the amount represented a portion of the amount due it under the retrospective premium adjustment provision in the 1990–92 Agreement. On July 9, 1992, Central States filed suit against Medica in the United States District Court for the Northern District of Illinois, seeking to recover the full amount due it under the retrospective premium adjustment provision.[3] On September 24, 1992, Medica brought this action against Central States in the United States Court for the District of Minnesota. In its Complaint, Medica asserts that Central States breached the 1990–92 Agreement by failing to pay the 1991–92 premium and by deducting $38,992.00 from its May 1992 premium payment. Medica also seeks declaratory relief in the form of a declaration that the Act renders the 1990–92 Agreement unenforceable.

(Order of Certification, Kyle, J., Civil No. 3–92–650, dated Jan. 27, 1993).

Judge Kyle denied without prejudice Medica's motion for summary judgment and certified to this court two questions of law, the first being:

> Does the language in Minn.Stat. § 62D.04, subd. 1(f), to wit:
>
> Upon receipt of an application for a certificate of authority, the commissioner of health shall determine whether the applicant for a certificate of authority has:
>
> (f) demonstrated that it will assume full financial risk on a prospective basis for the provision of comprehensive health maintenance services, * * *

prohibit any and all "risk sharing" arrangements except those meeting the requirements of Minn.Stat. § 62D.04, subd. 1(f)(2)?

*Id.*[4]

██ The commissioner of health cannot issue a certificate of authority to a health maintenance organization until the HMO, in addition to meeting the other requirements of the section, has "demonstrated that it will assume full financial risk on a prospective basis for the provision of comprehensive health maintenance services, including hospital care * * *." Minn.Stat. § 62D.04, subd. 1(f) (1992). Thereafter, the HMO "must continue to operate in compliance with the standards set forth in subdivision 1." Minn.Stat. § 62D.04, subd. 4 (1992). Medica contends that performing the terms of its agreement with Central States would constitute prohibited risk-sharing in violation of subdivision 1(f). Central States disagrees, arguing that the 1990–92 agreement did nothing to alter the fact that Medica bore the full financial risk of providing health maintenance services to the Central States members enrolled in the HMO.

Subdivision 1(f), while requiring HMOs to assume prospectively the full financial risk of providing medical services to their enrollees, does not prohibit

> a health maintenance organization from having a provision in a group health maintenance contract allowing an adjustment of premiums paid based upon the actual health services utilization of the enrollees covered under the contract, except that at no time during the life of the contract shall the contract holder fully self-insure the financial risk of health care services delivered under the contract.

Minn.Stat. § 62D.04, subd. 1(f)(2) (1992).[5] When the legislature enacted paragraph (2)

---

**3.** *Central States PHWFD v. MEDiCA,* 1:92–04484 (N.D.Ill.1992). One of Medica's affirmative defenses in that action is that the premium adjustment provision is voided by the Act. On December 14, 1992, United States District Judge George Marovich granted Medica's Motion to Transfer Venue of this Illinois action to this Court.

**4.** Because the question arose out of and was based on the facts set out above, it is clear that

the court meant "any and all 'risk sharing' arrangements" *between the parties in this case.*

Judge Kyle denied Medica's motion to reconsider, amend, or modify the order of certification.

**5.** The risk assumption requirement also does not prohibit

> a health maintenance organization from obtaining insurance or making other arrange-

in 1987 to allow HMOs to adjust premiums based on actual health services utilization, it created an exception to the general rule of subdivision 1(f) by which the financial risk of providing health services to enrollees could be shared. Medica interprets this provision to mean that the only premium adjustments permissible are those based on the actual utilization of services by enrollees. In Medica's view, the premium adjustment terms contained in the 1990–92 agreement are prohibited under subdivision 1(f)(2) because they are based, in part, on Central States' claims costs for its non-HMO members.

It is true that the premium adjustments provided for in the parties' agreement, based as they are on factors other than the actual utilization of health maintenance services by the Medica enrollees, do not fit under the paragraph (2) exception. However, the arrangement, which is not expressly prohibited by the statute, is permissible unless it violates the general rule of subdivision 1(f) by allowing Medica to assume less than the full financial risk of providing health services to the Central States members enrolled in the HMO. By agreeing to base the final premium calculation on Central States' costs for its non-HMO members, the parties in no way shifted from Medica the risk for providing health maintenance services to the HMO enrollees. As noted by counsel for Central States, "Medica could not pass any portion of its expenses off on Central States, or require Central States to pay additional premiums, simply because of any given level of health care costs incurred by the Central States HMO–Enrollees."

Medica argues that by capping the final adjusted premium at the lesser of (i) $274.76 per enrollee per month or (ii) Medica's actual costs, the agreement violates the provision of Minn.Stat. § 62D.04, subd. 1(f)(2) which prohibits the contract holder from fully self-insuring the financial risk of health care services delivered under the contract. This ar-

gument is in error. The possibility that an HMO's costs will be fully covered by the premium payments it receives from the contract holder exists in every HMO contract; that possibility does not make the contract holder fully self-insured. Moreover, Central States would never have paid more than $274.76 per enrollee per month, regardless of how high Medica's costs rose.

■ Although the language of Minn.Stat. § 62D.04, subd. 1(f)(2) seems clear, the parties disagree as to its meaning. Thus, the statute is, at least arguably, ambiguous and in need of judicial construction. *See Beck v. City of St. Paul,* 304 Minn. 438, 445, 231 N.W.2d 919, 923 (1975) (when at least two interpretations of language are possible, the court must ascertain probable legislative intent). In construing the statute, we may look to its purpose and legislative history.

■ The purpose of the Health Maintenance Act is to address the cost of health care to consumers and to make health care services more accessible. *See* Minn.Stat. § 62D.01, subd. 2 (1992). By eliminating barriers to the organization, promotion, and expansion of health maintenance organizations, by providing for their regulation by the state commissioner of health, and by monitoring their development, the legislature is able to assess the impact of HMOs on consumers with regard to health care costs, accessibility, and quality. *Id.*

The legislative history of the Act reflects nothing more than an intent to allow HMOs the freedom to contract with employers so as to share the financial risk of providing health services to the employees enrolled in the HMO, an arrangement previously prohibited under the general rule of subdivision 1(f). Medica is correct in noting that "[n]owhere in the legislative history is there any mention that a retrospective adjustment arrangement based on non-HMO enrollees would be permitted." However, neither does the history

---

ments (i) for the cost of providing to any enrollee comprehensive health maintenance services, the aggregate value of which exceeds $5,000 in any year, (ii) for the cost of providing comprehensive health care services to its members on a nonelective emergency basis, or while they are outside the area served by the

organization, or (iii) for not more than 95 percent of the amount by which the health maintenance organization's costs for any of its fiscal years exceed 105 percent of its income for such fiscal years * * * *

Minn.Stat. § 62D.04, subd. 1(f)(1) (1992).

mention that such an arrangement would be prohibited. In fact, the type of premium adjustment at issue in this case was not discussed at all, probably because such an arrangement does not violate—and therefore would not require a statutory exception from—the general rule of subdivision 1(f).

Medica also argues that a premium adjustment based on the non-enrollees' health costs does not comport with the legislature's objective of containing costs because it offers no incentive to the employer to reduce the utilization costs of the enrollees. This argument ignores the fact that the parties' arrangement in this case provided an incentive to Central States to contain the costs of its non-HMO members and an incentive to Medica to keep its costs competitive. The agreement was a cost controlling, not a risk sharing agreement.

■ Finally, Medica contends that the Department of Health agrees with its interpretation of Minn.Stat. § 62D.04, subd. 1(f)(2). The Department's opinion that subdivision 1(f)(2) prohibits a premium adjustment based upon non-HMO members does not preclude a different construction by this court. *See Reyburn v. State Bd. of Optometry*, 247 Minn. 520, 526–27, 78 N.W.2d 351, 356 (1956). Where, as here, the question is one of first impression and the administrative interpretation is not of longstanding, we need not accord that interpretation great weight. *See Minnesota Microwave, Inc. v. Public Serv. Comm'n*, 291 Minn. 241, 245–46, 190 N.W.2d 661, 665 (1971).

■ Minn.Stat. § 62D.04, subd. 1(f) does not expressly prohibit health maintenance contracts from being based on non-HMO enrollees; it simply requires HMOs to assume the full financial risk of providing comprehensive health maintenance services to their enrollees. Paragraph (f)(2) creates an exception to this requirement whereby premiums may be adjusted on the basis of the actual health services utilization of the enrollees. The agreement of the parties in this case, although not falling under the exception of paragraph (f)(2), is not prohibited because the arrangement did not shift from Medica the full financial risk of providing comprehensive health maintenance · services

to the Central States enrollees. The language of Minn.Stat. § 62D.04, subd. 1(f) of the Minnesota Health Maintenance Act does not prohibit any and all "risk sharing" arrangements except those meeting the requirements of Minn.Stat. § 62D.04, subd. 1(f)(2). We answer the first certified question in the negative.